Good morning, Your Honors. May it please the Court. My name is Michael Page. I'm counsel for Objector Ginger McCall. The settlement before you extinguishes the claims of over 3.6 million people. In return, the defendant, Facebook, has promised to give over $6 million to a foundation. If you would lift up the, there you go. In return, the defendant, Facebook, has promised to give over $6 million to a foundation whose co-president and one of whose three directors is Facebook's director of public policy. The foundation is, in the words of Lane's counsel, simply a conduit for the CyPrae funds, which will be distributed at a later date. The settlement should be rejected for two reasons. First, by giving the CyPrae funds to a foundation, controlled in part by Facebook, whose sole purpose is to redistribute the funds at a later date. The settling parties have effectively bypassed the district court's oversight role. Indeed, as Facebook's counsel acknowledged in the Fairness Hearing, the foundation was structured this way to give Facebook a voice in the process of distributing the funds. And second, the district court below did not evaluate each of the claims before deciding that the settlement was fair. All parties agree that heightened scrutiny is appropriate here because this is a pre-certification settlement. The only question is whether what the district court did satisfies heightened scrutiny.  The structure of the foundation offends two legal principles. There are two principal problems with it. First, Rule 23e2 states that a district court must conduct a fairness hearing and determine whether a settlement is fair, reasonable and adequate before approving it. As this Court has stated, the reason for requiring district court approval is to protect the interests of unnamed parties. Here, the foundation is effectively a black box. It is an organization, brand new, with no record of service, with only the vaguest admission statements. The only thing that determines what it does is align the bylaws. It states it will educate the public on critical issues related to online privacy and, I think, online privacy and safety. Again, there's no record of service. And it was even unclear until the briefs. Well, I'd like you to explain something to me. I had long understood ever since law school that what CPRE meant was changing the terms of a trust, typically a testamentary trust, so the grantor is dead and can't talk, so that the donor's intent could be realized as well as possible considering a change of circumstances. For example, if the donor leaves his fortune to the Philadelphia Museum of Art and then the Philadelphia Museum of Art merges with the Bucks County Museum of Art and no longer exists as a separate entity, CPRE can give the money to the Bucks County Museum of Art. There have been several class action cases using CPRE so that where the settling defendant has to give a big chunk of money, it's distributed to the plaintiffs to the extent the court can find them. And then once they can't find them and they still have money left over, it goes to some existing charity that the court thinks is more or less consistent in its objectives with the interests of the class. That's correct. Do we have past class action cases where CPRE has distributed money where members of the class could be found, but instead the money has gone to not previously existing charities? I'm not aware of a Ninth Circuit decision where that's been the case. It's certainly been the case in the district courts. In Molsky, this Court, I would say, left open whether and under what circumstances CPRE is appropriate in a case like this one. This Court has, I guess in dicta, embraced the principle, which applies both in the That's the traditional context in which CPRE was first used. That's where money goes directly to the class. There are unclaimed funds at the end. And what do we do with the unclaimed funds? It's been more recently expanded to a situation arguably like this case where direct distribution at the outset is infeasible. And, again, this Court in Six Mexican Workers and, again, in Molsky, has alluded to the infeasibility requirement. In the way that's been stated, and it was actually borrowed, I think, from this Court's decision in the American Law Institute's Principles of the Law of Aggregate Litigation, it states that CPRE is only appropriate where direct distribution is infeasible either because of the amount of damages would be so small, it's simply not worth it to distribute them. What would the amount of damages be here? Well, the total settlement, in my opinion, pardon me, or in the – so the settlement is from $9.5 million. Let's take the $9.5 million. $9.5 million minus the 30s fees. How much money would it wind up being for each member of the class? $6 million and change. It's over $6 million. Okay. And how – what would that amount to for each member of the class? Assuming there's not a subclass, which I think there might be, which goes to the second point of my argument, assuming there's just 3.6 million people, you know, that would, again, be a little under $2 a person. I believe Appellee's Counsel discounts that based on the cost of distributing that amount of money. I think there are ways around that. For example, the Beacon merchants here include Fandango, GameStock, Overplay, pardon me, Overstock, many online organizations. Facebook could purchase a giant gift certificate from them and email a $5 or $3 coupon that would allow them to purchase something online. That would at least minimize the cost of distributing the money. So let me stick with that point for just a moment. Are you categorically objecting to CPRAE in this case, or are you saying this CPRAE doesn't pass the test? The latter. My second point is that it's not yet clear that CPRAE. Let me back up for just a minute to the answer you gave me. Correct. Okay. There's, since postage now costs, what, $0.44 for a letter? Right. And the stationary has to cost something, let's say another, oh, $0.25, $0.50. Does it make any sense to mail around a bunch of $2 checks? No. I'm not arguing that it makes sense to mail around $2 checks. I don't know what amount would make sense to mail around. I think there are ways the class members could be compensated directly. Still, at $2, I don't think we're in direct distribution. Is there any authority for the proposition that when the damages for each member of the class are so small that they're not worth distributing because the cost of distribution would exceed the amount? Absolutely. That there should be no class action at all? I don't think there's any support in this circuit for that rule. Is there anywhere else? I'm not aware of one, no. As a practical matter. Right. Such a class action does not serve the purported clients, the members of the class, in the slightest. It only serves the interests of the lawyers. I think that's. No one else gets a nickel. No one benefits. Certainly right in this case. So is there any authority? The Supreme Court recently in Dukes v. Walmart. Right. Restricted what the Ninth Circuit had previously thought were the limits of appropriate class actions. Is there any authority for the proposition that where it would be worth nothing to the purported members of the class, that a class action is not permissible at all as a vehicle? I'm not aware of one, no, except for the fact that this Court arguably let that question open in Molsky. There is an analogous. Are you arguing that it's impossible to formulate a remedy, a CPRI remedy, that would be worth something to the members of the class? If these claims are, in fact, as invaluable, pardon me, as weak as the district court found them to be, and so the amount of money is correct, then I think there are many foundations out there that would be adequate CPRI recipients. It might, under some circumstances. Let me make sure you understand the thrust of my question because it's teeing off of Judge Kleinfeld's question. You say it would support many CPRI arrangements. Correct. But I'm asking you, would those or any of those CPRI arrangements provide some benefit to the plaintiff class? I mean, legally, yes. That's the way we use CPRI. I mean, whether it's a fiction that these foundations actually benefit the class. Could the Electronic Frontier Foundation have brought this case? I mean, they're an existing charity. It would be a whole lot smoother if all the money went to Electronic Front. Right. I think it's Electronic EFF. EFF is an organization, yes. They would not have had standing to bring this, right? To object? No, to bring the action, to be plaintiffs. The EFF had brought an action saying Facebook did wrong, therefore we should get $6 million. They certainly couldn't have made a claim on behalf of all the class members. I mean, they could have made a claim on behalf of their members. I was asking if they could make a claim on behalf of themselves. On behalf of their own members? Yes, I assume so. It wouldn't be a class action, and so it wouldn't be worth as much as a 3.6 member class action. But, yeah, I don't see why EFF couldn't bring a claim on behalf of its members. And, I mean, again, I'm not arguing that CPRI. Your coupon idea didn't sound like a very good one to me. Usually the companies have to pay somebody to distribute coupons advertising their business and offering discounts if people respond to the coupon. Well, I mean, generally I'm not a proponent of coupon settlements, and I think that is actually something that this Court should keep in mind as being a trend in class action settlements that the district courts have been pushing back against quite a bit. And this could easily become the next coupon settlement arrangement. Coupon settlements become a derogatory term. I know, and so I want to clarify how I'm using the word coupon. I think if Facebook were giving – if Facebook had harmed the class members and were giving them coupons that forced them to continue dealing with them, then that would be a classic coupon settlement arrangement that I would not stand behind. I guess we could do it for malpractice cases. For example, if you have a surgeon who kills patients all the time, you could have a class action malpractice case against him, and all of the patients would be offered a 50 percent discount on the next surgery. Right, exactly. That is a classic coupon settlement. And I think giving the class members a $10 gift certificate to Overstock or Fandango wouldn't fit into that category. I also – I really want to emphasize that one of the directors and the co-president here is Facebook's director of public policy. And so that's an additional problem to the fact that all they're doing is giving the funds to a brand-new organization with no track record that just is going to redistribute the funds at later days. Here, there's also the conflict of interest. The appellees argue that Facebook's employee is not going to be beholden to Facebook's interests, but that is the appellee's burden. The appellees have to show the court that the settlement is fair. Could you clarify something for me about the notice that was given in this case? The notice says, Under the settlement agreement, Facebook will terminate the Beacon program within 60 days of preliminary approval, if so approved by the court. My understanding of the facts was that, in fact, what had happened was Facebook had, I think they called it, suspended the program before a lawsuit was ever brought because of the uproar from their customers who discovered that their wives were finding out that they'd bought rings for their girlfriends or whatever. It became her ring eventually. It became – or somebody's embarrassed that their friends find out that they bought $1,000 shoes. Right. So they'd already suspended it. And there was kind of a brouhaha on the briefs about whether this telling the members of the class was deceptive or not, because Facebook had not ended the program. It had suspended it, but it had not terminated it or something. I didn't understand it. Could you clarify it for me? Of course. And that point goes both to the overall fairness of the settlement and whether notice was adequate. It was my understanding that, based on a letter from Mark Zuckerberg to Facebook users, that the Beacon program was ended in 2008. Based on that, it didn't seem like meaningful relief to cancel the Beacon program. There's been some confusion in the briefing whether the program was canceled, whether it was changed from an opt-out program to an opt-in program, or whether it just continued existing the entire time. There's been no discovery. I can't see any problem if you have a legitimate and fair opt-in. I agree. That's why I think it's a different beast entirely if it's an opt-in program. There would be no BPPA claims if this were an opt-in program. So if it exists as an opt-in. And if I sign something that tells the videotape store, you can tell everybody in the world what videotapes I rented, no problem. So unless there's still a current opt-out only Beacon program, and I've seen no evidence that that's the fact and some evidence that it's not. So what is the difference between suspend and cancel and terminate? What actually changed as a result of the settlement? As a result of the settlement, I have no idea what the current status of the Beacon program is. Did they promise never to let it rise from the dead, that there would never again be such a program? It is unclear what the promise to cancel the Beacon program means, whether that means that it has to be something named the Beacon program that is covered, whether they can have a similar program with a different name that seems like it would be permissible. I believe I made that point in my brief, and the appellees responded, well, yes, but then they could bring another lawsuit. So that does seem to be a problem with that aspect of the settlement. The fact that none of this was fully explained in the notice of the parties is a reason that I think that notice was also not sufficient. But I think the court can get there in the fairness of the settlement aspect as well. Now, I understand you don't like the settlement, and I understand that the hook you're using is that there are enough red flags or danger signals or whatever we want to call it that the district judge should have given it more scrutiny. Is there any burden on you to propose in concrete terms what you think a better settlement would have been? I understand you gave us this idea about a coupon of which we could buy some merchandise from somebody else. I got that. Okay. What's your burden here in terms of what you have to come forward with? I don't know what my burden is, but this is what I would like in a perfect world. First, I would like the district court to actually evaluate the five claims of the class members. Here it did not do that. It only discussed them in total. It talked about how the facts should be vigorously disputed and how they raised novel legal theories of little precedent. That was it. That was the extent to which the district court evaluated these claims. I want the district court to look at the elements of the claims and say, this is why they are or are not likely to succeed. If the district court does that, first it might find there's a subclass of VPPA members who have stronger claims. Again, the VPPA is $2,500 per occurrence per person of statutory damages. Every time somebody without your permission says, what videotape you got from Blockbuster, you're entitled to $2,500. Correct. And there are VPPA claims against Blockbuster, against Fandango, against Overstock. Those Blockbuster claims are in this settlement, not just the Texas settlement? Correct. Correct. So the district court might have found that there's a subclass, and that subclass we have no idea how big it could be. It might be 10,000 people. If it's 10,000 people and those claims have some value, then those people could certainly be directly compensated. So first and foremost, I want a finding that that is or is not the case. Assuming that the district court does this, looks at the claims, says they're not likely to succeed, the class is $3.6 million, there's no subclass, direct distribution is impossible. It would be silly. It would be too small. Then I think, ideally, the SIPRE funds, I think SIPRE would be fine if direct distribution is infeasible, should go to an established organization, one with a record of service that this Court can actually look at and say, yes, if we give the funds to that organization, they will, in fact, benefit the class members. And that organization should be independent. As the American Law Institute states, there should be no significant prior affiliation between the SIPRE recipient and the settling parties. So I think under some circumstances, there might not be an existing organization. Could this settlement wind up going to the lawyers and their families and some Facebook executives who wind up being the salaried employees and consultants for the new charities? I think that's the current structure of the settlement, correct. I mean, certainly the class counsel benefit. I don't know. I mean, in the bylaws it mentions. I think initially in the bylaws the lawyers don't get paid, but I suppose that can be changed, right? The class counsel? Right. I mean, the class counsel makes $2.85 million from this. No, I mean, they don't get paid out of the ‑‑ they become consultants to the new charities. Yes, they're on the board of legal advisors. The bylaws say they won't be paid as advisors. That's correct. And I don't, I mean, I don't recall exactly what the bylaws says about the compensation. Are the bylaws changeable? Can the board of the new charity change the bylaws? The board can change the bylaws. I believe that's by unanimous vote of the three directors. The three directors can change the bylaws. Correct. I was thinking if they actually got any consultation from the lawyers, it would seem unfair to everybody that the lawyers are working for nothing. So they might want to change it. They might. That's right. Okay. You've got a minute left. Let's hear from the other side. Thank you. Good morning, Your Honors. Michael Rhodes on behalf of Facebook. And are you going to split the argument? I'm going to take ten minutes, and then we'll split the argument, and I'll sit down. Okay. I'm not going to make any prepared marks. I'd like to address the Court's questions to counsel, if I may.  The bylaws say that the board of the new charity is not paid as advisors. The bylaws and the charter documents make it explicit that the purpose is very constrained. That was reviewed by Judge Seaborg. Can they be changed by the directors? In theory, but the order of the court will be that is the organ that I'm approving, and the idea that the two lawyers are going to sit in the boardroom for free, I'm not in the business of giving my time away, is for us, the two of us that actually negotiated this deal over a year, to make sure that the purposes of this foundation are actually served. That was the intent. You know, I had problems right from the get-go on this deal. But one thing that puzzled me is, if you are going to give the $6 million to somebody other than the people who reportedly suffered the harm, why not some existing independent organization? Like, I don't mean to boost EFF. I just use it as a hypothetical possibility. I couldn't see any reason to create this new charity, except to maintain control by Facebook and Plaintiff's Counsel and to funnel money to them. I couldn't see any other reason why you wouldn't use an existing charity. I have to defer to the second. Yeah, and I'll be explicit with you. I reject that assertion for two reasons. One is, this was a hotly negotiated deal overseen by a very experienced mediator, Mr. Piazza. The idea was that the two of us were not smart enough to figure out where $6 million should go. I don't believe it. Well, in 2008, Your Honor, go back and try to figure out where you're going to give $6 million. That is a lot of money to allocate. And whether you disagree with it or not, the creativity that we were trying to fulfill was the idea that people experienced in this kind of work. We actually went out and tried to find two very independent people, coupled with one Facebook person who, by operation of the bylaws, can never veto any money. I can think of a couple with no sophistication at all on my part, right off the bat. There's some kind of Center for Electronic Privacy at Yale. There's EFF, and those are just the first two that occur to me with no significant thought given to it. I'm sure if I Googled the problem, I'd come up with a much more adequate solution in seconds. Yeah, or if you really want something different from an established organization and you want it to be creative and so on, why don't you have three independent people? Why is there a Facebook representative on this group? And I think Judge Seaborg directly took that up below in the answer. I want your answer. Well, my answer is why do we have to see the entire debate on funding sources? We don't have the ability. Now, that's not answering my question. Why isn't it a good idea to have three totally independent people running this organization? It may be, but we were concerned. Why is it a better idea to have Facebook as one of the three with, I understand, one person out of three can be outvoted, but one person out of three often has a very substantial influence as to what happens. Well, we wanted a right to be at the table to discuss the sources that are going to receive the money, because in point of fact, you see, that's, to me, the weak point of the settlement. We would have that right in any event. Normally what happens is we negotiate. Or you wouldn't if you actually went to trial and lost. No, no, but my point is in normal settlements, we negotiate the recipients. We go to the court and say this is who we're going to give it to. And we have, in the negotiations, I have a voice. Look, not all cases get settled. Some go to trial, and somebody wins, somebody loses. And the loser doesn't get to say how the money is spent. No, but if you're going to settle in this case, which is, I think, the policy that I'm hearing from the objectors is, they want me to litigate longer, get into discovery, and actually try to value the individual claims. We tried to settle early. Let me tell you what really bothers me here so you can wash away my concerns. You have what purports to be an action on behalf of a lot of people who were wronged. Some of them were wronged by the invasion of their privacy, like the plaintiff where his wife learned from Facebook that he'd bought a ring, and she said, What's this about you buying a ring? What's that all about? Fortunately, he'd bought it for her, at least so he now says, instead of a girlfriend. But it's a pretty big invasion. And I was thinking if some woman bought extremely extravagant shoes, and her friends or her husband or her boyfriend find out just what kind of money she spends on shoes, that messes up a lot of important relationships. And those, they're serious claims. It's hard to say how much money people are entitled to for the damage to their relations. Then you've got other people. Somebody who appears to be a very respectable person and a deacon of his church, and the church finds out he's been renting R-rated movies. Some liberal faculty member at a very liberal college turns out to be a big John Wayne fan. Some very moralistic person has been renting orgy of barely legals. And ever since the Bob Bork debacle where the reporters found out what tapes he was renting, Congress made it against the law with a $2,500 penalty for every disclosure for that sort of thing. We've got those disclosures here. None of these people who were wrong get a nickel. What's more, they don't even get any kind of injunctive relief because the program ended before the lawsuit even started. They get nothing. All they are is a vehicle for the lawyers to make money and for Facebook and the lawyers to decide who to give some more money to, and they control that so they can make sure it goes to their friends or family or whoever. I don't see anything in this for the class, and it's hard for me to see how it could be approved. So teach me. May I? Please. So first principles. On the VIPA claim, there is no secondary liability for Facebook under VIPA, number one. The law is clear about that. We made a motion to dismiss on that. Say that again. I got lost. I was translating the abbreviation. On the Video Privacy Protection Act, the acronym VPPA, we say it VIPA. I apologize to the Court for the acronym. There is nothing in the statutory language or legislative history that supports secondary liability. The statutory modifier is knowingly disclosed. Secondly, the only people who could be liable would be Blockbuster and not Facebook for disclosing what Blockbuster disclosed. Correct. The dynamic that was different in this case on the facts of this record is that Blockbuster went bankrupt. And in this case, there were two class actions. So these people could be claimants, I guess, in the Blockbuster bankruptcy. But bear with me. In Texas, two class actions were filed. So you're saying if the video store tells the reporter, well, reporter is a special class, I guess. The video store tells Facebook what movie somebody rented. And then Facebook tells everybody else. Yes. No liability for Facebook, just the video store. And the video store is broke. Yes, because in the contract, the video store represents and warrants that they're compliant with law. They have the requisite consents from their constituency. That lawsuit was actually filed in Texas, a class action against Blockbuster. Well, that doesn't matter to this lawsuit. Yes, it does, because those people tried to intervene in this case. They tried to intervene. Judge Seawork heard them. They were then invited back to the final settlement approval hearing, where they argued at length that having looked at the totality of the circumstances, they had become satisfied that having once been against the settlement, they now understood why it made sense in light of what happened to Blockbuster in the interim, which is they went bankrupt. Who else was going to be liable for that claim? The objectors put way too much stock in the value of that claim. How much should the claimants get in the Blockbuster bankruptcy? I don't think they got anything that's still in bankruptcy. Can they get 50 cents on the dollar or a dime on the dollar? I don't know. I'm not counsel for Blockbuster in the Texas case, Your Honor. I'm thinking a $2,500 claim against a bankrupt could still be worth 500, 1,000. I don't know. I don't know. But if the lawyers are being asked to negotiate settlements. It's not totally persuasive to me because the way settlement of a class action, actually the way settlement of big cases sometimes goes is basically the defendant bribing the plaintiff's lawyer to throw the case. That's the economic structure. I'm not suggesting that anyone here did that. But it's the economic structure. The money to the lawyer is great enough so that it is not worth pursuing the case on behalf of the purported client. Much easier to do where you have an essentially nonexistent client as in a class action. May I direct you to the procedural history of the review? 3.6 million notices, four objectors, all representing privacy advocacy groups that disagree with us philosophically, perhaps as Your Honor does. Half the notices to every AG in the land, nobody objected. 100 opt-outs. The market of fair ideas was at work here. That's what produced the settlement. And maybe you quarrel with our pedantic attempt to try to come up with a greater solution. The notice, if I'm one of the victims of this, hypothetically, judges aren't allowed to join Facebook, so we don't have firsthand knowledge of it. But suppose hypothetically I'm one of the victims and I read that Facebook will terminate this program and I'm among the very rare people who didn't just throw the thing in the trash and actually read it. I say, well, good. I'm really glad that this class action obtained that. That's worthwhile. Why isn't that an important misleading statement in the notice? Because the program had already been terminated. It's factually incorrect. Let me give you the dates. It launched on November 7th of 2007. It was changed in terms of the opt-in, opt-out ratchet on December 5th, 2007. It continued. It was discontinued as, in fact, the code was disabled within 60 days of the preliminary notice. But opt-in, opt-out is really the whole deal. I agree with you. But the question was when they say you didn't kill them. Was the opt-in, opt-out changed? The opt-out, 10 seconds to opt-out was gone months before the lawsuit was filed? It was changed within the first 30 days. And that's months before the lawsuit was filed? The lawsuit was filed in August of 2008. This occurred back in December of 2007. So the lawsuit did not cause that to change? The opt-out change had already occurred. So the lawsuit accomplished nothing? I disagree. In March of 2009, I was still drafting a settlement agreement trying to revive Beacon under a set of considerations that we couldn't get to closure on. That's what precipitated the second mediation in Hawaii with Mr. Piazza. We were still trying to figure out how to do Beacon. Is there a promise never to revive Beacon now? In the settlement agreement. I thought it just terminated it. I didn't think it promised never to revive it. It says that if the settlement is not approved, we reserve the right to bring it back. But if the settlement is approved, if the settlement is approved, is there a promise not to revive Beacon? Yes. It kills it and you can't bring it back. Where does it say it? I'll find it for you. Bear with me. It's in the record, Your Honor, it's ER 87, lines 21 through 24. And what does it say? It says in connection with the settlement, I'm going to paraphrase it. Facebook shall terminate the Beacon program in its entirety. In the event that the settlement is not finalized in its entirety, then Facebook reserves the right to restart or reactivate Beacon. So if the settlement is concluded, it cannot be reactivated or restarted. Where does it say it cannot be reactivated after it's been terminated? It doesn't explicitly say that. I think it's pretty clear. If you order me as a termination to terminate it as a court order, I'm not going to reactivate it. Isn't it correct that the members of Facebook don't have to pay Facebook? It's free. The service is free. And it's decided to go there and share information. So what that means is the only way Facebook can make money is by selling its customers. I mean, if it's free for them, they're the product. If it can't make money, it can't exist. And the way it would sell the customers effectively is by reviving something like Beacon. I disagree. I think it makes it clear from that language. And if the language is not as sharp as one would like, I thought it was clear that Beacon was being killed, and only if the settlement didn't go forward as a final act could it be restarted. Is there any covenant in this settlement agreement, assuming it is confirmed and approved, is there any covenant not to revive a program in which customer information is shared without customers' affirmative consent? I think that's what that says. But if you disagree with me, I guess what I would say to you is the market acts pretty quickly. This week alone, ten class actions were filed against Facebook for allegedly violating privacy rights. There are currently over 25 of these class actions. I don't think there's any shortage of people willing to police everything that Facebook does. Well, that answer is basically, yeah, we can revive it, but they can sue us. No. It says in the event that the settlement is not finalized in its entirety, then Facebook reserves the right. It doesn't have any reservation rights. But the soft spot on this one is you agreed to terminate Beacon, but the definition of Beacon is not provided. Beacon is defined. Well, no, but what I mean is something that looks an awful lot like Beacon may or may not come within that. So I don't know, and I'm sympathetic. It's very hard to say precisely what the features might or might not be, but it's pretty clear that Facebook has reserved, and I don't blame it, the right to have all kinds of programs in which they sell information about their customers. I mean, that's their business. Yes, and as Your Honor pointed out, this case was not about the Beacon functionality. It was a question of whether Facebook had adequately obtained the consents in the first instance to do what it wanted to do. That's what the case was about. It wasn't about whether you could ever have a business model. Well, the real problem here was you only have ten seconds to opt out. Initially, that was the allegation, right. And you have to opt out or else your purchases are disclosed to all your Facebook friends. And what happened was the market didn't like that. Twenty-eight days of chaos, the company said, we got it wrong. They changed it, right. That's what happened. I suspect there's somebody behind you who would like to speak. Yes, I should speak. Why don't we set the clock at ten minutes for you. Thank you. May it please the Court, Scott Camber on behalf of the company. You'd set the clock at ten minutes, please. If it may please the Court, I'll jump right in, actually, on the last issue because it seems to be somewhat central right now. Thank you. And that is whether the injunction is meaningful. And I think the record, and I think it's really important here that we tether the discussion to the record. And I think some insight about the record in this case is that the appellants actually did not submit a transcript, an 85-page transcript of the proceedings that deal with an awful lot of the things that they say the Court didn't consider. Are they in a supplemental excerpt? They are, Your Honor. They're in a supplemental excerpt, both submitted by Facebook and also submitted by. . . So the SCR has the transcript. Yes, they do. Yes, it does. And in particular, the one thing I think that's particularly important to tether here is that Beacon itself was ongoing during the life of the litigation until preliminary approval, and that, yes, it changed from an opt-out to an opt-in process. But the reason that the injunction here is meaningful, and that was the reason that actually the mediation we wound up having six months trying to negotiate this piece, is because Beacon was broken. Beacon didn't work. It was claimed to be an opt-in program, but it didn't function right for many, many users. That was the whole problem. That's why we were trying to negotiate between the first mediation session and the second mediation session. We spent six months trying to negotiate the terms by which Beacon could be reworked, by which way Beacon could be saved. The final conclusion. . . Beacon didn't work. They don't have enough money at Facebook to hire software engineers? At that time, Your Honor, Facebook wasn't exactly what it was today, and what we're really dealing with in Beacon is not a program with a particular name. We're dealing with a program, an underlying software program, which was Beacon. That software was fundamentally flawed. But when you say it didn't work, do you mean even people who did not opt-in were still having their privacy invaded? Yes, Your Honor. For certain people, the opt-in, opt-out process didn't work. So in reality, although Facebook intended to change it from opt-out to opt-in, the Beacon software was originally. . . But if they can't do what they intend to do and say they're doing, and when the market tells them quit doing it, how are they going to do any better when the injunction says to quit doing it? Well, because that was why we needed to kill the program. That's why Beacon ceases. That software program that was identified as Beacon, and it is a particular program, it was stopped. Facebook today does other things, but it was different source code rewritten from bottom to top that actually functions as it's supposed to function. The issue here, and the reason that Beacon is the key part of that injunction is to kill Beacon, is because Beacon didn't work, but it would appear it was represented to have worked. And I think that was a real contribution that was made by the class, by class counsel. So the contribution was to, what, get Facebook to hire software engineers who could do what Facebook had already been trying to do? We had them stop using Beacon. Beacon was terminated as part of the settlement on preliminary approval. And, therefore, the idea here that was suggested by appellants that Beacon was terminated or suspended prior is just not right. And it's reflected in the record. It's not just me here testifying as counsel. The record itself makes it very clear that in the transcript, the supplemental transcript, pages, I think, 14 through 22, and that goes through. And that was acknowledged. At the hearing, appellant's counsel, that was understood. There was no issue with respect to the notice being inaccurate because, factually, the notice is accurate, Your Honor. Now, how much evidence did, I mean, and I'm not talking evidence rather than lawyer talk. Yes. How much evidence, if any, did Judge Seaborg have in front of him as to how Beacon was broken and how much good you did for the plaintiff class by having them terminate Beacon? He had the, he had declaration, at the time he had declarations of counsel, and he had questions at the hearing for final approval. It was 85 pages in which he questioned extensively counsel for Facebook, counsel for the class, as well as giving an opportunity to be heard by Ms. McCall's counsel. So I guess the answer to my question, which was how much did he have independent of what counsel said, the answer is nothing. There was, except for a few exhibits that didn't directly go to that point, he did not have any original source evidence going to that particular point. Nor testimony from experts who actually ran the program and so on. He just didn't have that. He had representations from lawyers. He did, and there was nothing on the record. There was none of the objectors coming forward questioned that assumption. That was acknowledged to be accurate. What use, if any, or what benefit, if any, is provided to the plaintiff class by this nonprofit organization that's being set up? In answering your question, if I may take a step back and look at the Cypre vehicle generally. The Cypre, here it was acknowledged, again, by Ms. McCall's counsel at the hearing that it's $1.12, that the distribution was accepted by both appellants and appellees at the hearing that $1.12 would be the distribution amount. So the question is would a Cypre here have a purpose or not? As counsel, and this is in the record in my declaration to the lower court, the reason that we went to the foundation, the idea of the foundation, is because if we use the conventional list approach for the distribution would be virtually, it would be about $7 million, that it would be both counsel, both Facebook's counsel and class counsel, would have to agree on each and every recipient. That's not my question. I understand all that stuff. But my question is this nonprofit that you're setting up that has three people who run it, one of whom is from Facebook. Yes. What benefit is that providing to the class? There is a specific nexus to the claims. In Article 3, it states that the foundation, everything else is an ultra-virus act, that it shall fund and sponsor programs designed to educate users, regulators and enterprises regarding critical issues relating to protection of identity and personal information online through user controls and protection from online threats. So that money could be paid right back to Facebook to have notices and big letters that say if you don't want people to know stuff about you, don't friend them. Well, I think in this situation, Your Honor, there are two independent directors there, firstly. Secondly, there is a built-in monitoring process by which you have two officers of the courts, both Facebook's counsel and myself, who without compensation, it was represented to the court and represented in the papers that we would never take compensation for that. Is that part of the settlement agreement? It is part of the settlement agreement, Your Honor. You would never do it or that the foundation is not set up in such a fashion as which it can now give you that money? Specifically, it was in the papers it says we shall not be paid for it. As they shall not, and the representation was made before Judge Seaborg in the court that we would not ever take money for that. There was never the intention here, either control or otherwise. With respect to the nexus, to answer your question, that particular nexus is exactly what this case is about. It is the research that might be done by Berkeley, might be done by Yale, might be done by many universities out there and other public interest groups that detected that, for instance, that Beacon wasn't functioning properly, that people should be educated in a particular way. One of the red flags here is, of course, the presence of Facebook as one of the three people. And you heard me before, obviously two beats one. So the other two can outvote Facebook. On the other hand, we all know the dynamic of small organizations. A single person very often has a significant degree of influence as to what happens. Why not have three independent people? Because it is a negotiated term of the settlement. This is at the mediation, without waiving mediation, just to give you what was in the record. No, I'm not asking for what was in the record. What was in the record was that the parties were not able to agree on a list of Cypher recipients, firstly. Secondly, as class counsel, I believe $7 million is so much more money than has ever been given in one fell swoop to relatively small privacy organizations nationwide, be it EFF, be it EPIC, et cetera, that I thought it was important that that money not be given out all in one tranche. So that, in addition to the list... You're still not quite responding to my question. My question is not, why did you set up a new organization? I understand the reasons for that. They may be good. They may be bad. I understand the reasons for that. My question is, why does that organization have Facebook as one of the three people who can control it? Because in negotiating, because otherwise Facebook would get a 50-50 chance, would get to negotiate if there was a list. So to me, it was better to have a third.  You're presenting that, though, as though it's adversarial and this is the best we could get from Facebook and still settle the case. But it seems to me that it's not really adversarial. As long as the lawyers get a couple of million bucks, what do they care, whether Facebook is one of the three or zero of the three? Your Honor, my career has been dedicated to being a class action attorney. I was also a defense attorney before that. Many people in my office, several people in my office were at the AG's office and were enforcing these from the governmental side. My perspective is that the role, and I come from a slightly different political perspective than many members of the plaintiff's bar. I view us as, both from a libertarian perspective, I view it very important that we occupy a role in assisting the self-regulatory environment. I don't believe fundamentally, and I would not believe that the reason I'm doing this, there's easier ways to make a living than bringing privacy cases, which I think it's important to mention, that five cases in this circuit, in the district court, in the last six months, five cases very similar to this case, were dismissed on motions to dismiss for lack of Article III standing. Now, I'm not saying this case would or wouldn't, but I'm saying this is a very difficult area. There are easier ways to make a living than being a class action attorney in this way. I'm not saying I'm appreciative and we're very successful in what we do, but the idea that I would come before a court and put forward a settlement, and this is not a settlement that we didn't think would get attention. This, from day one, we always knew this settlement would get a tremendous amount of attention, and one day we would be standing here in this building. Mark Zuckerberg himself actually showed up as the client representative from Facebook at this. There has been tremendous publicity for this case throughout. At the end of the day, there was direct notice that was given to 3.6 million people, two different ways, both by Facebook message and also by e-mail. Out of that, which, you know, in the Hanlon case, the court makes very clear that that is an objective, positive commentary as to fairness. You got 100 people who opted out. You had six objections. And the objector that appears here on appeal is the executive director of Epic, which is in the record and was acknowledged by Judge Seaborg that a motivation of them coming here and objecting to the settlement was because they were not being given the money. Mark Rotenberg, the executive of Epic, said unless he received all of the money, nothing could be a fair vehicle. That is in the record. And I think it's important here to look at what we've accomplished in the idea that, yes, would I prefer for Facebook to not have a seat at the table? Sure. But at the end of the day, do I believe the class was fundamentally better off to have a $9.5 million settlement when we could have lost it? The class doesn't get the settlement. The class doesn't get a nickel. It goes for the benefit of the class, Your Honor. Certainly, the benefit of the class. The money, some of it goes to the lawyers and the rest goes to outfits that the lawyers and Facebook choose. The lawyers have no vote in the process, Your Honor. The class members never get a nickel. Well, just because a class member doesn't receive a nickel, frankly, this is more beneficial to the class, $7 million to go to privacy organizations and to go to education that are there to look out for the privacy of the class than a $1.12 check to each member of the class. This is fundamental. If I'm a class member, suppose hypothetically I were a class member, I don't like these organizations at all. I think they're really wrongheaded. I just don't want my wife knowing that I gave jewelry to my secretary. Then opt out? I get nothing. Then, Your Honor, very simply, maybe you were one of the 100 people who opted out of the settlement. Maybe you were one of the six people who objected. This was not a mandatory class like Mulski. There were alternatives here. This, when you look at the world of privacy settlements, when you look at the risks, fundamental risks that we face based on secondary liability. Well, if you can't give the money to the class that represents damages that were done to the class, I don't actually see why Facebook shouldn't keep the money as opposed to some new or old nonprofits getting the money and then giving it out in salaries. Your Honor, that argument, the jurisprudence of this circuit at the present time is that CyPray settlements are permissible under certain circumstances. When there's only $1.12 to distribute per class member, this is one of those circumstances. I don't think the other side is arguing that CyPray is categorically inappropriate. The issue is whether or not this CyPray is something that the district judge should have paid more attention to. If you compare this case to another one that's coming up on your docket, Your Honor, that had a very different approach. It was a similar settlement in many ways, but they just gave a list. They gave a list of people who shall receive all of the CyPray, and it's a similar size CyPray. And in the settlement agreement, the defendant in that case had to come to an agreement for each recipient with plaintiff as to who shall receive the list. In that situation, which follows more closely to, I think, there's obviously more volume of jurisprudence, even though one looks at, from D.C. Circuit, the Mexican money transfer case, there's almost an identical situation to this, which was approved by the D.C. Circuit. But if you look at that situation, when looking at the list, Your Honor, here it was a determination at the mediation, determination and idea by the mediator that I accepted and I think made a lot of sense that the class has more input into the process and making sure that Facebook has less input if we structure it this particular way. That's ultimately, I think, the class is much better off with this. I thought through this in many ways. Thank you. Thank you very much, Your Honor. I'll make several very brief points. First, Lane's counsel keeps equating the role Facebook has in, pardon me, in selecting a CyPray recipient in a normal course which is then reviewed by district court with the influence it has as a director and co-president of this foundation. The critical difference there is the district court's oversight. Here it's nonexistent once the settlement is approved. Second, you asked for evidence about Beacon status from the record. That is not statements of counsel. I direct you to page 142 to 44 of the excerpts of record. There you have Mr. Zuckerberg's remark that last week we changed Beacon to be an opt-in system and today we're releasing a privacy control to turn off Beacon completely. That's page, again, 142 to 44. With respect to the function of the system. There's no evidence that it didn't work. Correct. Opposing counsel says it didn't work. We have evidence that it didn't work. We don't have evidence that it didn't work. As far as I know, there's no evidence that it didn't work. We have statements of counsel that it didn't work? Correct. Statements of counsel in front of the district court that it didn't work? Correct. We do have McCall's experience, which I admit seems inconsistent with Mr. Zuckerberg's statement here. That could be an anomaly. It could be that it was working periodically. It could be that it didn't work, but there's no evidence to that effect. Third, with respect to the final fairness hearing, I want to refer to this court to page 58, which is the extent of the district court's evaluation of the claims. That's it. In the 85 pages. Page 58. And there's nothing about the individual claims. There's something about whether Facebook has a defense to the Video Privacy Protection Act. Mr. Freeman, my co-counsel, says it might, but there's been no discovery, so we don't know. The district court then says, but is Facebook really a videotaped service provider? Mr. Freeman then says, well, there are other ways that Facebook could be liable. For example, there could be an indemnity agreement. We, again, don't know because there hasn't been discovery. That's it. One page. With regard to the strength of the VPPA claims, first, they're not just against Blockbuster. There are several other defendants. There are several ways in which Facebook could be accountable. Again, one of the allegations was that Facebook aided and abetted or conspired to violate the VPPA. In addition, there could be an indemnity agreement. Also, this might well have been a breach of contract because Mr. Zuckerberg, in his letter to the Beacon merchants, stated this will be an opt-in system. Blockbuster probably knew that were it an opt-out system, it could be in legal trouble. So if Facebook's program was not what it advertised, then certainly Blockbuster might have a suit against Facebook. With regard to Harris Counsel's statements, appellees rely heavily on their about-face. I want to remind this Court, the Harris class counsel attempted to intervene. Harris class counsel, without any material changes in the settlement, made a complete about-face and sought money from this case, from the attorney's fees in this case, which the district court rejected. The page is no, we know that. Okay. So I think very little credibility from Harris counsel. Finally, with organizations that might be reasonable alternatives to this foundation, there's the Electronic Frontier Foundation, the Privacy Rights Clearinghouse, the Center for Digital Democracy, the World Privacy Forum, the Rose Foundation, the Electric Privacy Information Center, among many others. That's on page 36 of my opening brief. My favorite would be Bolt Hall. Now, the PLI does say no prior significant affiliation with the court or the settling parties. So just putting that out there. Thank you. Thank you. Thank both sides for good arguments. Lane, Facebook, McCall, submitted for decision. We are now adjourned.
judges: Hug, Kleinfeld, Fletcher